IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| LOVIE BRANDON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:05-0352 |
| | ) Judge Campbell |
| LIFE INSURANCE COMPANY OF | ) |
| NORTH AMERICA, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

This action arises out of Plaintiff Lovie Brandon's claim for recovery of long term disability benefits, pursuant to an employee group disability income policy, maintained by her former employer, Science Applications International Corporation ("Science Applications"), and insured by Defendant Life Insurance Company of North America ("LINA"). Currently pending before the Court are cross-motions for judgment on the administrative record by Defendant (Docket No. 15) and by Plaintiff (Docket No. 17) and responses thereto (Docket Nos. 19 and 20).

## I.  FINDINGS OF FACT[1]

Plaintiff Lovie Brandon, now a 53-year-old female, began working for Science Applications on December 15, 2003, as a senior systems engineer. (AR 0004). Through her employment with Science Applications, Ms. Brandon received a disability policy with LINA for long term disability.

---

[1] The facts are gleaned from the Administrative Record ("AR") which consists of 393 pages filed by Defendant on July 29, 2005 (Attach. to Docket No. 12)

1

She became eligible for coverage under the policy on December 15, 2003.[2] (AR 0060). The policy defines "Disabled" as follows:

> An Employee is Disabled if, because of Injury or Sickness,
>
> 1. he or she is unable to perform all the material duties of his or her regular occupation, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings; and
> 2. after Disability Benefits have been payable for 24 months, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings.

(AR 0072). The policy defines "Sickness" as "[a]ny physical or mental illness." (AR 0088).

The policy contains a "Pre-Existing Condition Limitation," as follows:

> The Insurance Company will not pay Disability Benefits for any period of Disability caused by or contributed to by, or resulting from, a Pre-Existing Condition. A "pre-existing condition" means any Injury or Sickness for which the Employee incurred expenses, received medical treatment, care or services including diagnostic measures, took prescribed drugs or medicines, or for which a reasonable person would have consulted a physician within 3 months before his or her most recent effective date of insurance.

(AR 0078).

On July 22, 2003, Dr. Charles W. Miller, a dermatologist, began treating Ms. Brandon for a generalized rash she had experienced for the previous two months. (AR 0218, 0224-225). After his initial examination, Dr. Miller diagnosed Ms. Brandon with eczema secondary to an infection, but noted that further testing needed to be conducted to rule out scleroderma and dermatomyositis.

---

[2]The policy effective date is January 1, 2003. (AR 0069). There is no eligibility waiting period for employees hired on or before, or after, the policy effective date. (AR 0072).

2

(AR 0218). In his notes from July through September 2003, Dr. Miller documented Ms. Brandon's history of erythematous papules, fatigue, muscle weakness, and hyper-pigmentation and hypo-pigmentation of the chest, axilla, and inner thighs. (AR 0218-0219). According to Dr. Miller, Ms. Brandon declined further diagnostic testing in August 2003 because she did not have insurance at the time and was "trying to save money for" the tests. (AR 0218, 0223).

Ms. Brandon's symptoms persisted through September 2003, despite treatment for eczema with various medications, including Prednisone. (AR 0219). Ms. Brandon also began having difficulty raising her arms around this time. (Id.) On September 23, 2003, Dr. Miller ordered a skin punch biopsy of muscle from Ms. Brandon's right chest. (Id.) The cutaneous pathology report from her biopsy indicated a clinical diagnosis of "dermatomyositis, SLE, chronic eczema and dermatoheliosis, CTCL," but the slides tested showed no evidence of "dermatomyositis, SLE or CTCL." (AR 0219, 0222). The report further indicated that the changes in the fragment of skin tested were "not fully diagnostic," and therefore, did "not represent a specific disease process." (AR 0222). The dermatopathologist who drafted the biopsy report commented that Ms. Brandon's skin changes "may be consistent with some external trauma" or "may be consistent with a chronic eczema." (Id.) His pathologic diagnosis was ICD-9 code 698.3, Lichen simplex chronicus. (Id.)

On November 18, 2003, Dr. Miller recommended a second skin punch biopsy; however, Ms. Brandon asked Dr. Miller to delay that test until she had insurance. (AR 0220). Dr. Miller continued to treat her, along with Dr. Alex K. Mammen, her primary care physician. (AR 0096-0142). Her symptoms gradually worsened, and she began experiencing shortness of breath, greater muscle weakness, and significant weight loss by December 2003. (AR 0247-0248).

From February 2004 through April 2004, Ms. Brandon underwent a series of pulmonary, cardiac, and laboratory tests at St. Anthony's Medical Center in St. Louis, Missouri, in an attempt to determine the underlying cause of her multiple symptoms, which included skin rashes, muscle weakness, fatigue, shortness of breath, and dysphagia. (AR 0235-0273). She had been placed on Maxair and other brochodilators, and had developed anoxeria by March 2004, but no etiology of her symptoms had been confirmed to date. (AR 0247-0249, 0260). Dr. Mammen admitted Ms. Brandon to St. Anthony's Medical Center on April 16, 2004, for chronic respiratory failure, proximal muscle weakness, and dysphagia. (AR 0247-0250). Dr. Zafar Quader's initial impressions on April 17, 2004, were "dyspnea, etiology unknown at this time," a musculoskeletal disease such as lupus or scleroderma, and/or "myopathy." (AR 0247-0250). The physicians treating her conducted extensive testing but remained unable to determine an etiology for Ms. Brandon's symptoms. (AR 0235-0246).

Ms. Brandon subsequently was transferred to Vanderbilt University Medical Center ("Vanderbilt") in Nashville, Tennessee, for further diagnosis and treatment, and she remained hospitalized from April 30, 2004, through May 25, 2004. (AR 0151-0152). Upon admission to Vanderbilt, Ms. Brandon had diffuse hyper-pigmented splotches across her upper chest and bilateral knees and she exhibited diminished breath sounds. (AR 0208-0210). Based on the symptoms noted at intake and a review of her available medical history, Vanderbilt's Dr. Bradley A. Hardin made a differential diagnosis of "connective tissue disorder including polymyositis-dermatomyositis, scleroderma, lupus, mixed connective tissue disease; a vasculitis, possibly PAN; an infiltrative process, including amyloidosis, and unlikely sarcoidosis; a neoplastic syndrome including

4

lymphoma, lung/breast." (AR 0209-210).

While hospitalized at Vanderbilt, on May 3, 2004, Dr. Susan Naselli, the attending neurologist, noted that the "distribution of weakness and elevation of CPK" muscle enzymes seen in Ms. Brandon supported a diagnosis of dermatomyositis, but Dr. Naselli recommended further testing to confirm. (AR 0197). On May 3, 2004, Dr. Ingrid Avalos suspected "the possibility of neuromuscular disease involving [Ms. Brandon's] respiratory of [sic] upper GI tract system." (AR 0199). Although Dr. Ingrid also considered dermatomyositis and scleroderma as possibilities, she opined that dermatomyositis was "unlikely" due to Ms. Brandon's normal skin punch biopsy and stated that she would have expected "to see more involvement in proximal muscles and maybe skin involvement" with dermatomyositis. (AR 0199, 0202). Still, she felt that "diseases such as scleroderma, dermatomyositis or undifferentiated connective tissue disease could present with some of her findings but we can't find enough evidence to classify her underlying process into one of these categories." (AR 0202).

On May 17, 2004, Dr. Nancy Olsen, the attending rheumatologist, seeking to avoid another muscle biopsy due to Ms. Brandon's weakened condition, recommended a neuromuscular pathology review of the September 23, 2003 biopsy, in addition to testing recommended by Dr. Naselli. (AR 0171-0172). Dr. Olsen stated that Ms. Brandon did "not appear to have had a rash that would qualify her as having dermatomyositis" but pointed out that "[s]ometimes the presence of inflammatory infiltrates . . . may be a secondary process after there is muscle damage from another cause." (AR 0171). She further noted that "the pattern of inflammation and fiber loss can be difficult to interpret." (Id.) On May 19, 2004, Dr. Olsen wrote that she had discussed with pulmonologist Dr. Beverly Butka "the possibility" that Ms. Brandon might have scleroderma lung

5

disease.  (AR 0167).

The neuromuscular pathology review ordered by Dr. Olsen revealed that the specific section of muscle examined on September 23, 2003, had not been taken from a weakened area, and thus would not show inflammatory infiltrates--a characteristic sign of dermatomyositis.  (AR 0197, 0222).  At the conclusion of the review ordered by Dr. Olsen, the biopsy report was amended "to reflect perivesicular inflammation."[3]  (AR 0151).

Ms. Brandon underwent electrodiagnostic testing on May 7, 2004, and in his Electromyographic report ("EMG"), Dr. Anthony Kilroy noted that the study was abnormal and "suggestive electrically of an acute myopathy."  (AR 0188).  Based on the amended pathology report for the September 23, 2003 biopsy and the results of the EMG, Ms. Brandon's treating physicians at Vanderbilt diagnosed her with dermatomyositis.  (AR 0344).

Ms. Brandon was discharged from Vanderbilt and transferred to Stallworth Rehabilitation Hospital ("Stallworth"), also in Nashville, Tennessee, on May 25, 2004.  (AR 0151-0153).  The Vanderbilt discharge summary identified a principal diagnosis of dermatomyositis and secondary diagnoses of esophageal dysmotility secondary to dermatomyositis, chronic respiratory failure secondary to dermatomyositis, malnutrition, and hypertension.  (AR 0151).

Following her discharge, Ms. Brandon received continued outpatient rehabilitation and physical therapy treatments at Stallworth.  (AR 0341).  Ms. Brandon returned to Vanderbilt in October 2004 for a rheumatology examination by Dr. John S. Sergent (AR 0328-0332, 0341-0345), and thereafter, for a pulmonology examination by Dr. Butka (AR 0333-0339) for follow-up of her

---

[3]The same report states on a different page: "The outside hospital muscle biopsy was reviewed and amended to note perifasicular inflammation."  (AR 0152).

dermatomyositis. Dr. Butka noted a primary diagnosis as of November 4, 2004, of dermatomyositis (ICD-9 Code 710.3) and a secondary diagnosis of respiratory failure. (AR 0331-0333). By November 2004, Ms. Brandon's dermatomyositis had improved, and Dr. Sergent indicated that Ms. Brandon could likely start back to work in six months if she continued to improve without relapse. (AR 0330, 0342).

After receiving short term disability benefits from her employer from April 16, 2004, through October 13, 2004, Ms. Brandon sought long-term disability ("LTD") benefits under the policy through LINA. On November 9, 2004, Ms. Brandon filed a claim for LTD benefits indicating that she had become disabled by "MUSCULAR DISEASE/SURGERY/DERMATOMYOSITIS" as of April 14, 2004. (AR 0299-0301)(emphasis in original). Because she claimed disability within twelve months of her effective date of coverage, LINA began a pre-existing condition investigation. (AR 0078). LINA reviewed the medical treatment, care, or services Ms. Brandon received during the three months prior to her effective date of coverage (September 15, 2003 through December 14, 2003)("the look-back period"). (AR 0368-0369).

Specifically, Ms. Brandon's claims file was reviewed by a registered nurse in addition to two "case managers" and an "appeals claim examiner." (AR 0023, 0090-0092, 0213-0217). LINA case manager Maggie Torress wrote in an internal LINA e-mail to another LINA case manager on November 17, 2004, "This claim seems to be approvable, huh?" (AR 0326). Apparently, Ms. Torres sent her impressions of Ms. Brandon's claim to the wrong person because the recipient of her e-mail replied: "I am not the CM for this claimant . . . . This claim belongs to Monica Marciano, CM. Thank you for the information." (Id.)

On December 13, 2004, registered nurse Ruth Pautz concluded that during the pre-existing

7

condition period, Ms. Brandon was receiving "workup" and treatment for an unexplained rash, and that one of the possible diagnoses at the time was dermatomyositis. (AR 0023). Ms. Pautz's report indicated that the claim manager for Ms. Brandon's claim was Monica Marciano. (Id.)

On December 14, 2004, case manager Monica Marciano notified Ms. Brandon by letter that her claim had been denied because "[t]he records received from Dr. Miller and Dr. Mammen support that you received treatments, took prescribed medications, and consulted a physician for dermatomyositis" during the pre-existing period. (AR 0213-0217).[4]

Ms. Brandon appealed the denial, questioning LINA's review of her medical history in September 2003 and insisting that she had only been diagnosed with eczema prior to her effective date of coverage. (AR 0094-0095). On February 10, 2005, appeals claim examiner Troy Phillips informed Ms. Brandon by letter that her appeal of LINA's denial of benefits had been denied. (AR 0090-0091). Mr. Phillips noted that no new information was submitted by Ms. Brandon in support of her appeal; thus, LINA's previous finding that Ms. Brandon had been treated for "eczema and dermatomyositis" during the pre-existing period would be upheld. (Id.) He informed Ms. Brandon that she had the right to bring a legal action against LINA under ERISA based on the final decision to deny her claim for benefits. (Id.) She did not file an appeal.

On April 29, 2005, Ms. Brandon filed the instant action, asserting that LINA had wrongfully denied her claim for LTD benefits in violation of 29 U.S.C. § 1132(a)(1)(B). (Docket No. 1). LINA filed its Answer on June 17, 2005. (Docket No. 9). LINA filed the Administrative Record on July 29, 2005. (Docket No. 12).

---

[4]In her letter denying Plaintiff's claim, Ms. Marciano erroneously stated that after the skin punch biopsy on September 23, 2003, doctors diagnosed Ms. Brandon with dermatomyositis, SLE, chronic eczema, and dermatoheliosis, CTCL. (AR 0214).

8

## II. CONCLUSIONS OF LAW

The parties have filed cross-motions for judgment on the administrative record (Docket Nos. 15 and 17).

### A. Standard of Review

The Supreme Court instructs that a denial of benefits challenged under ERISA "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). The language of the plan determines whether the court must apply the arbitrary and capricious standard of review or whether the court must review the determination de novo. If the language of the plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe plan terms, the highly deferential arbitrary and capricious standard applies. Id. "While 'magic words' are unnecessary to vest discretion in the plan administrator and trigger the arbitrary and capricious standard of review, this circuit has consistently required that a plan contain 'a clear grant of discretion [to the administrator] to determine benefits or interpret the plan.'" Perez v. Aetna Life Ins. Co., 150 F.3d 550, 555 (6th Cir. 1998)(en banc)(quoting Wulf v. Quantum Chem. Corp., 26 F.3d 1368, 1373 (6th Cir. 1994)(emphasis in original)).

Here, the relevant plan language provides that:

> Satisfactory proof of Disability must be provided to the Insurance Company, at the Employee's expense, before benefits will be paid.

(AR 0077). The policy identifies the "Insurance Company" as "the entity named on the Policy cover page." (AR 0088). The entity named on the cover page is LINA. (AR 0069). Thus, LINA

9

is the Insurance Company referred to in the policy, and satisfactory proof of disability must be provided to LINA, at Ms. Brandon's expense, before benefits will be paid. (AR 0069, 0077). This language is sufficiently clear and express in granting discretionary authority to LINA to interpret the plan and to assess claims for plan benefits. See Perez v. Aetna Life Ins. Co., 150 F.3d 550, 555-57 (6th Cir. 1988)(holding that plan's language requiring "satisfactory evidence" to be provided to insurer was sufficient to vest insurer with discretion, thus triggering arbitrary and capricious standard of review); Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380-81 (6th Cir. 1996)(finding that plan's language requiring claimant to present "satisfactory proof of Total Disability to us" vested insurer with discretion and triggered the arbitrary and capricious standard of review); Miller v. Metro. Life Ins. Co., 925 F.2d 979, 983 (6th Cir. 1991)(finding that plan's language stating disability was determined "on the basis of medical evidence satisfactory to the Insurance Company" vested insurer with discretion, triggering the arbitrary and capricious standard of review). Accordingly, the Court finds that the arbitrary and capricious standard of review applies to Defendant LINA's denial of benefits.

**B.     Conflict of Interest**

In her Response to Defendant's Motion, Plaintiff contends that heightened scrutiny should be applied to LINA's review process because LINA has a "clear" conflict of interest since it operates as both decision-maker and payor of claims. (Docket No. 20 at 2). However, the existence of a conflict of interest does not change the standard of review under which the Court evaluates Plaintiff's claim. It is merely a factor for the court to consider in determining whether there has been an abuse of discretion. Davis v. Ky. Fin. Cos. Retirement Plan, 887 F.2d 689, 694 (6th Cir. 1989); see also Firestone, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, Comment d

10

(1959)); see also Univ. Hospitals, 202 F.3d at 847. In other words, "the abuse of discretion or arbitrary and capricious standard still applies, but application of the standard should be shaped by the circumstances of the inherent conflict of interest." Borda v. Hardy, Lewis, Pollard & Page, P.C., 138 F.3d 1062, 1069 (6th Cir. 1998).

Here, because LINA serves as claims administrator and funds the policy,[5] "it incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the denial or discontinuation of benefits." See Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d Cir. 1997). That is "[a]s administrator, it interprets the plan, deciding what expenses are covered, and as issuer of the policy, it ultimately pays those expenses." Killian Healthsource Provident Adm'rs, Inc., 152 F.3d 514, 521 (6th Cir. 1998); see also Miller v. Metro. Life Ins. Co., 925 F.2d 979, 984 (6th Cir. 1991) ("Because an insurance company pays out to beneficiaries from its own assets... its fiduciary role [as the decision-maker for benefits] lies in perpetual conflict with its profit-making role as a business, and the conflict of interest is substantial.") This unique position creates a conflict of interest that, although not determinative, must be weighed by the Court in its review of LINA's denial of benefits to Plaintiff.

**C.    Application of Arbitrary and Capricious Standard of Review**

Having established the appropriate standard of review, and keeping in mind the existence of a conflict of interest, the Court must now determine whether LINA's decision denying Plaintiff benefits was "rational in light of the plan's provisions." Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1998). "In other words: When it is possible to offer a reasoned explanation, based on the

---

[5] For purposes of ruling on the parties' cross-motions, the Court assumes this fact. Defendant LINA has not disputed it.

11

evidence, for a particular outcome, that outcome is not arbitrary or capricious." Smith v. Ameritech, 129 F.3d 857, 863–64 (6th Cir. 1997)(citing Davis v. Ky. Fin. Cos. Retirement Plan, 887 F.2d 698, 693 (6th Cir. 1989) (internal quotations omitted)). "The arbitrary and capricious standard is the least demanding form of judicial review." Hunter v. Caliber Sys., Inc., 220 F.3d 702, 709–10 (6th Cir. 2000).

However, the Sixth Circuit has made clear that the arbitrary and capricious standard of review is not a mere formality:

> [M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions. As we observed recently, "[t]he arbitrary-and-capricious . . . standard does not require us to merely rubber stamp the administrator's decision." Jones v. Metropolitan Life Ins. Co., 385 F.3d 654, 661 (6th Cir. 2004). Indeed, "[d]eferential review is not no review, and deference need not be abject." McDonald, 347 F.3d at 172. Our task at all events is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." Id.

Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005).

In conducting an arbitrary and capricious review of the administrative record, only the facts known to the administrator or fiduciary at the time it made the decision are considered. Id. at 378-79. Thus, the Court's review is confined to the Administrative Record as it existed on February 10, 2005, when LINA issued its final decision upholding the denial of Plaintiff's LTD claim.

Plaintiff asks the Court to enter judgment on the Administrative Record in her favor, ordering LINA to pay her LTD benefits. (Docket Nos. 17 and 18). Alternatively, Plaintiff asks that the Administrative Record be opened "for additional discovery." (Id. at 6). Plaintiff raises three arguments in her Motion. First, she asserts that "a question may exist" as to whether the policy

12

grants discretionary authority to LINA; therefore, the de novo standard of review applies.[6] (Docket No. 18 at 3)(emphasis added). Second, she asserts that the Pre-Existing Condition Limitation is ambiguous and should be construed in her favor to include an actual knowledge requirement. (Id. at 5). Third, she asserts that LINA did not meet its burden in proving that the Pre-Existing Condition Limitation was applicable to her claim because there is no proof in the record that she received treatment for dermatomyositis or was told she suffered from dermatomyositis during the three months prior to her effective date of coverage. (Id. at 4 and 6). Defendant contends that all of these arguments are without merit and should be rejected by the Court. (Docket No. 19 at 2-9).

Defendant also seeks judgment on the Administrative Record in its favor, contending that LINA's decision should be affirmed because Plaintiff is not entitled to LTD benefits due to her "pre-existing" condition of dermatomyositis. (Docket No. 16 at 6). Specifically, Defendant contends that: (1) medical evidence pre-dating Ms. Brandon's disability claim supports the existence of a pre-existing condition; (2) medical records post-dating Ms. Brandon's disability claim support the continuing effects of a pre-existing condition; and, therefore (3) LINA's denial of Ms. Brandon's LTD claim was reasonable and supported by the Administrative Record. (Id. at 8-14). In response, Plaintiff reiterates the arguments made in her Motion and maintains that LINA based its denial of her claim on an erroneous reading of a pathology report. Thus, according to her, LINA's decision

---

[6]The Court has determined that the arbitrary and capricious standard of review applies in this case. (Mem. Op. at pp. 9-10). The policy's failure to identify LINA as the plan administrator or a fiduciary does not change the Court's finding. The policy clearly indicates a contract between Science Applications and LINA. (AR 0069). See Webber v. AETNA Life Ins. Co., 375 F. Supp.2d 663, 670 (E.D. Tenn. 2005)(finding that plan language indicating a contract between employer and insurance company represented an agreement between parties that insurance company would act as fiduciary in evaluating claims for purposes of ERISA).

13

was arbitrary and capricious. (Docket No. 20 at 4).

Having carefully reviewed the Administrative Record and the parties' briefs submitted in support of their cross-motions for judgment on the administrative record, and considering the conflict of interest present in this case, the Court finds that LINA's decision to deny an award of LTD benefits to Ms. Brandon was not arbitrary and capricious. That is to say, it is possible to find a "reasoned explanation, based on the evidence" for LINA's decision. See Williams v. Int'l Paper Co., 227 F.3d 706, 712 (6th Cir. 2000).

Ms. Brandon claims she became disabled by muscular disease/surgery/dermatomyositis on April 16, 2004. Because Ms. Brandon claimed a disability within twelve months of her effective date of coverage (December 15, 2003), her claim became subject to review under the Pre-Existing Condition Limitation of the policy. Plaintiff claims this provision is "likely ambiguous" in that it is unclear whether Plaintiff is required to have knowledge of the pre-existing condition. (Docket No. 18 at 5). According to Plaintiff, she must have had actual knowledge that she was suffering from dermatomyositis during the look-back period in order for that condition to be a "Pre-Existing Condition" as defined in the policy. (Id.)

The Court disagrees. The Pre-Existing Condition Limitation is clear and unambiguous. It does not require that Plaintiff or her physicians possess actual knowledge of the cause or causes of her condition during the look-back period. Nor does it require that the medical condition be definitively diagnosed during the look-back period. To read this provision as Plaintiff urges would be to rewrite the provision, injecting an actual knowledge or definitive diagnosis requirement-- neither of which is stated in the policy itself.

LINA received Ms. Brandon's application for LTD benefits on or about November 2, 2004.

Pursuant to the terms of the policy, LINA reviewed any and all medical treatment, care, or services Ms. Brandon received, including diagnostic measures, during the look-back period. The Administrative Record reveals that Ms. Brandon underwent a number of diagnostic measures and received almost constant medical treatment and care for symptoms associated with dermatomyositis from September 2003, through the date she claims to have become disabled in April 2004, and beyond confirmation of her diagnosis of dermatomyositis in May 2004. While Ms. Brandon's physicians were not able to make a definitive diagnosis of dermatomyositis before May 2004, many of them indicated in their notes that dermatomyositis was a possible or probable cause of Plaintiff's symptoms.

For example, during the look-back period, Dr. Miller indicated in his office visit notes, in his orders for a cutaneous pathology report, and in a letter to Plaintiff's primary care physician that one of the possible diagnoses for Plaintiff's condition was dermatomyositis. Upon her admission to Vanderbilt Hospital, Dr. Bradley A. Hardin made a differential diagnosis of "connective tissue disorder including polymyositis-dermatomyositis, scleroderma, lupus, mixed connective tissue disease; a vasculitis, possibly PAN; an infiltrative process, including amyloidosis, and unlikely sarcoidosis; a neoplastic syndrome including lymphoma, lung/breast." (AR 0209-210). Vanderbilt attending neurologist Dr. Susan Naselli and resident physician Dr. James Felder Selph opined that Plaintiff's physical symptoms and lab results supported a diagnosis of dermatomyositis. (AR 0197, 0206). Although other possible diagnoses were considered, nearly every physician who examined or treated Plaintiff considered dermatomyositis as a possible cause of her symptoms.

It is undisputed that Ms. Brandon experienced symptoms during the look-back period which

15

are commonly associated with dermatomyositis, including progressive muscle weakness, fatigue, dysphagia, and shortness of breath. Critically, the biopsy performed on Plaintiff during the look-back period was relied upon by physicians at Vanderbilt, along with a subsequent EMG, in diagnosing her disease in May 2004. Thus, the medical records and other evidence clearly establish a causal link between the symptoms from which Plaintiff suffered during the look-back period and the condition with which she was ultimately diagnosed and for which she seeks LTD disability benefits.[7]

Under these facts, and applying the highly deferential standard of review, the Court cannot say that LINA's decision to deny benefits based on the Pre-Existing Condition Limitation was arbitrary and capricious. LINA's decision is sufficiently grounded in reason and evidence to satisfy the "least demanding form of judicial review." Davis, 887 F.2d at 693. For these reasons, LINA's decision must be affirmed.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion for Judgment on the Administrative Record (Docket No. 15) will be GRANTED, and Plaintiff's Motion for Judgment on the Administrative Record (Docket No. 17) will be DENIED. Defendant LINA's decision to deny

---

[7]Plaintiff points out that LINA case manager Monica Marciano misread the pathology report and relied on her erroneous reading in concluding that Ms. Brandon had been diagnosed with dermatomyositis during the look-back period. (Docket Nos. 0021-0022, 0213-0215). Plaintiff is correct that while the report included a clinical diagnosis of dermatomyositis and other conditions, the skin punch biopsy showed no evidence of dermatomyositis. (Id.) Although Ms. Marciano may have misunderstood or misinterpreted the report and its diagnosis, LINA's decision to deny Ms. Brandon's claim for benefits still stands because there is sufficient evidence in the record to affirm it under the arbitrary and capricious standard of review.

Plaintiff LTD benefits based on the Pre-Existing Condition Limitation in the policy will be AFFIRMED.

An appropriate order will enter.

_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE

17